**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | **Case No. 24-cr-183 (RC)** |
| **v.** : | |
| : | |
| **ERIC STAPLES,** : | |
| : | |
| **Defendant** : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Eric Staples to 14 days of incarceration, followed by 12 months of supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution and a mandatory assessment of $25.

**I.      Introduction**

Defendant Eric Staples, a 34-year-old massage therapist, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

1

Staples pleaded guilty to a violation of 18 U.S.C. § 1752(a)(1). As explained herein, the government's recommendation is supported by the defendant's breach of the Capitol building through a broken window adjacent to the Senate Wing Door, mere minutes after the second violent breach of that area. Even though Staples remained inside the Capitol building only for approximately a minute and a half, "any participation in an insurrection, even if [the] participation was limited . . . mandates some punishment." *United States v. Anthony Griffith*, 21-cr-244 (CKK).

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, therefore, the facts and circumstances of Staples's crime support a sentence of 14 days of incarceration, followed by 12 months of supervised release.

## II.     Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol including in the stipulated Statement of Offense. *See* ECF No. 21.

*Defendant Staples's Role in the January 6, 2021 Attack on the Capitol*

On January 5, 2021, Staples traveled from Houston, Texas to Washington, D.C., where he met up with members of his family and a friend, Ruben Reyna,[2] all of whom had also traveled

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] Reyna was separately charged for his activities at the Capitol on January 6, and, on January 12, 2024, he pled guilty to a violation of 18 U.S.C. § 1752(a)(1). *United States v. Ruben Reyna*, 23-cr-350 (CKK), ECF No. 18. Reyna was sentenced by Judge Kollar-Kotelly on June 14, 2024 to 14 days' incarceration, followed by 12 months of supervised release. *Id.* Jun. 14, 2024, Minute Entry.

from out of town. Staples had suggested that these family members meet him in Washington, D.C. to attend the "Stop the Steal" rally together. *Id.* at ¶ 8.

Staples posted to his personal Facebook page on January 5, 2021, stating that he was "[o]n [his] way to the snake pit of Washington DC." The post also included the hashtag "#StopTheSteal." *See* Image 1.



*Image 1: Screenshot of January 5, 2021, Facebook Post by Staples*

On January 6, 2021, Staples attended the "Stop the Steal" rally at the area near the White House known as the "Ellipse." Staples knew and understood from President Trump's remarks at the rally that Vice President Pence would be present at the Capitol that day. While still at the Ellipse, Staples began receiving phone calls from friends asking if he was okay. *Id.* at ¶¶ 10–11.

After attending the rally, Staples walked from the Ellipse to the grounds of the U.S. Capitol at around 1:00 p.m on January 6, 2021. Staples approached the Capitol from the west and entered the area of the Capitol grounds known as the West Plaza. While there, Staples posed for a photograph with Reyna, below, in which he held up four fingers to signify "four more years" of a Trump presidency. *Id.* at ¶¶ 12–13. *See* Image 2.

3



*Image 2: Photo of Staples Posing with Reyna on Capitol Grounds, Posted to Reyna's Facebook*

Staples knew at the time he entered U.S. Capitol grounds that he was not permitted on the grounds. While on and near the West Plaza, Staples saw plumes of tear gas billowing in the air, heard people loudly chanting, and saw some rioters climbing up walls. *Id.* at ¶ 14.

After other rioters overwhelmed the police lines on the West Plaza, forcing officers to retreat, Staples joined the mob in advancing on the Capitol, ultimately reaching the Capitol's Upper West Terrace. While on the Upper West Terrace, Staples saw other rioters wearing body armor, helmets, and gas masks. *Id.* at ¶ 16. In Image 3—a still from a video Reyna recorded while standing near Staples on the Upper West Terrace—some of these rioters can be seen standing in front of a shattered window.



*Image 3: Screenshot from Gov. Sent. Ex. 2 at 00:01 Seconds, with Rioters Circled in Red Wearing Body Armor, Helmets, and Gas Masks*

Reyna's video also depicts rioters entering the Capitol building through the Parliamentarian Door, which had just been violently breached at 2:42 p.m. In the video, Staples stands next to Reyna, just a few yards away from the Parliamentarian Door and its shattered windows, and loudly shouts "USA." Gov. Sent. Ex. 2 at 00:25–00:29.

At approximately 2:53 p.m., Staples entered the U.S. Capitol building through a broken window next to the Senate Wing Door—which rioters had breached a second time just five minutes earlier, Gov. Sent. Ex. 1 at 00:20–02:00, after police had secured the area following the initial breach at 2:13 p.m. As Staples entered the building, he saw shattered glass on the ground and heard a high-pitched alarm sounding in the doorway. ECF No. 21 at ¶ 18.



*Image 5: Screenshot from Gov. Sent. Ex. 1 at 06:40, with Staples Circled in Red*

From his position inside the window, Staples saw a line of police officers in riot gear attempting to contain the mob that had breached the Capitol. *Id.* at ¶ 19. *See* Image 6.



*Image 6: Photograph Posted to Reyna's Facebook Page, Showing the Vestibule Inside the Senate Wing Door and the Police Line with Backs Against the Wall*

Staples remained inside the Capitol building for approximately one and a half minutes before exiting the building via the same broken window through which he entered at 2:55 p.m.

6

After leaving the Capitol building, Staples remained on the Upper West Terrace for approximately ten minutes before leaving Capitol Grounds. *Id.* at 20–21. He later told the FBI that, during those ten minutes, he got into an argument with a man he thought was a member of Antifa.

Later that day, after he had left the Capitol, Staples posted to his Facebook page: "It is the peoples house, not Chinas."



*Image 7: Screenshot of January 6, 2021, Facebook Post by Staples*

<u>Defendant's Interview with the FBI</u>

On December 16, 2021, Staples gave a voluntary interview to the FBI, at the FBI's Cheyenne Resident Agency in Wyoming. Staples was joined at the interview by his then-attorney. When asked what he did at the Capitol, Staples responded that he "hung out," and, when asked to clarify, he stated that he did not remember what he did at the Capitol. Only after the FBI agent conducting the interview pushed back, telling Staples that Staples knew whether he went into the Capitol building, Staples acknowledged that he did, in fact, remember what he did at the Capitol on January 6.

Staples told the FBI that he entered the Capitol building through a window and said that he stayed inside for approximately 30 seconds. He also told the FBI that he did not think his friend, Ruben Reyna, ever made it inside the building.[3] When shown an image of himself inside

---

[3] In a stipulated Statement of Offense, Reyna acknowledged entering the Capitol building through a broken window—the same window through which Staples entered—and remaining inside for approximately one minute. *United States v. Ruben Reyna*, 23-cr-350 (CKK), ECF No. 17.

the Capitol building, Staples commented on the line of police officers visible against the wall, saying that they did not care and were just standing and letting people go. He also claimed to have seen videos where police officers affirmatively let people into the Capitol building on January 6. Staples told the FBI that being inside the Capitol building did not feel right because it felt like a "set up." Perhaps relatedly, Staples repeatedly told the FBI about rioters he suspected of being Antifa members and even described getting into an argument with one such rioter after he exited the building.

Staples also commented on his decision to delete his Facebook page after being shown a Facebook post by Reyna, in which Staples was tagged. Contrary to his assertion in the PSR that he deleted his Facebook account because he was embarrassed by his actions, PSR ¶ 48, Staples told the FBI that he deleted the account because he was getting doxed.

*The Charges and Plea Agreement*

On April 11, 2024, the United States charged Staples by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and 1752(a)(2) and 40 U.S.C. §§ 5104(e)(2)(d) and 5104(e)(2)(G). ECF No. 9. On April 24, 2024, pursuant to a plea agreement, Staples pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1). By plea agreement, Staples agreed to pay $500 in restitution to the Architect of the Capitol. *See* ECF No. 20, ¶ 12.

**III.     Statutory Penalties**

Staples now faces a sentencing for violating 18 U.S.C. § 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to twelve months of imprisonment and a fine of up to $100,000. ECF No. 20, ¶ 1. The defendant must also pay restitution under the

terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.  The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

18 U.S.C. § 1752(a)(1)

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | −2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 49–56.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

While the Government concedes that Section 4C1.1 applies to the defendant, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted the certification of the 2020 Electoral College vote count, did

irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-

seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

The U.S. Probation Office calculated Staples's criminal history as zero (Category I). PSR at ¶ 61. Accordingly, the U.S. Probation Office calculated Staples's total adjusted offense level, after acceptance, at 2, PSR at ¶58, and his corresponding Guidelines imprisonment range at zero to six months. PSR at ¶¶ 110. Staples's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

### V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 14 days' incarceration followed by 12 months of supervised release.

#### A. The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while

staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Staples's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Staples, the absence of violent or destructive acts is not a mitigating factor. Had Staples engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Staples's case is the timing and location of his entry into the Capitol Building. As seen in Gov. Sent. Ex. 1, rioters began a coordinated effort to breach the Senate Wing Door around 2:47 p.m. The CCTV footage shows a group of rioters forming a column and pushing against the line of U.S. Capitol Police officers guarding the doorway. At approximately 2:48 p.m., this group breached the Senate Wing Door. A crowd of rioters then streamed in through the door and surrounding windows. It was this chaotic scene that Staples saw as he approached the Capitol Building. Sirens blared, shattered glass covered the ground, and the police were backed against the wall. Despite these clear signs that anyone, let alone a mob that was overpowering the police, was prohibited from entering, Staples not only entered the Capitol Building (through a broken window, no less) but also paused to film and take photographs of the scene. Moreover, even though he could see that the mob vastly outnumbered the police, he later described the police as mere casual bystanders who were just letting people go. The egregious circumstances of Staples's entry into the Capitol Building demonstrate a significant disregard for the law and counsel in favor of a term of incarceration, rather than just probation.

### B. Staples's History and Characteristics

As set forth in the PSR, Staples was raised in a two-parent home and describes his upbringing as occurring in a supporting and loving environment. PSR ¶ 67–68. He maintains a

good relationship with both of his parents and his only sibling, a brother. PSR ¶ 68.

Staples reports being in relatively good physical health, and, although he notes a degenerative eye disease, he is not currently in treatment for any physical condition. PSR ¶ 76. In terms of his mental health, Staples has indicated that he was treated for depression when he was 17 years old. PSR ¶ 78. He reports that this depression was treated through individual counseling and prescription antidepressants. *Id.* However, Staples does not report any current issues with depression, or any other mental health condition, and is not currently in treatment for such a condition. *Id.* Moreover, a diagnosis of depression—absent other factors—does not mitigate Staples's actions on January 6. There is no indication that depression correlates with a reduced ability to exercise self-control and good judgment. Therefore, Staples's physical and mental health provide no mitigation for his acts on January 6.

In 2012, Staples obtained a diploma in massage therapy from Moore Career College in Baton Rouge, Louisiana. PSR ¶ 84. At the time of his offense, Staples was employed as a massage therapist in Houston Texas, and, at the time of his arrest, he was employed in a management position at a spa in Girdwood, Alaska. PSR ¶ 92, 94. Staples has stated that he was terminated from his position in Alaska due to his arrest, PSR ¶ 92, but he has obtained new employment as a massage therapist in Phoenix, Arizona. PSR ¶ 88. He also anticipates beginning a second position as a massage therapist in Glendale, Arizona in September 2024. PSR ¶ 90. While the loss of his position in Alaska due to his arrest undoubtedly caused some difficulty for Staples, engaging in criminal conduct usually will have meaningful employment consequences without regard to criminal penalties. Moreover, the loss of his position in Alaska has not affected his long-term employment prospects: Staples has since obtained new employment and will be beginning a second job at some point during the month of this sentencing.

Staples has been married since 2016, and, with his wife, has a five-year-old daughter. ¶ 69. Staples's wife is a homemaker, so he is the sole financial provider for his family. ¶ 69, 71. Notably, these are not new developments in Staples's life. On January 6, 2021, Staples had a wife and a daughter, and, as far as the government is aware, he was at that time their sole financial provider. Nevertheless, Staples traveled to Washington, D.C., and engaged in criminal conduct at the Capitol without regard for the risks this behavior posed to his family. He should not now be allowed to cite these responsibilities, which he ignored on January 6, as mitigation for his criminal acts.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233 (ABJ), Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this particular defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most

14

compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a short term of incarceration.

First, although Staples accepted responsibility by stipulating to all of the facts underlying his crimes and resolving his case via a plea agreement, his post-January 6 statements, including to the FBI and to the U.S. Probation Office, raise some concerns. In the PSR, Staples asserts his remorse, saying that "it wasn't until [he] got back to [his] hotel" on January 6 that he realized the gravity of that day's events. PSR ¶ 48. And yet, a few hours *after* he left the Capitol on January 6, Staples posted to Facebook that "It is the peoples house, not Chinas." (Presumably, in this instance, "it" refers to the Capitol building.) He likewise told the U.S. Probation Office that he understood "what [he] did" and "[t]hat's why [he] deleted his Facebook account." *Id.* But that contradicts his earlier statement to the FBI, in which he explained that he deleted his Facebook account because he was being doxed. Moreover, nowhere in his statement to the U.S. Probation Office does Staples acknowledge the impact of his, and other rioters', actions on the police who were working at the Capitol on January 6. This is in stark contrast to his statements to the FBI that the police were just standing around and may have even let rioters into the building.

15

Instead of focusing on the victims of the riot, Staples's statement of "remorse" in the PSR focuses primarily on how his actions have "affected [his own] life" and caused him embarrassment. *Id.* The Court should therefore view any remorse Staples expresses at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Staples's inconsistent statements regarding his remorse suggest that additional punishment is needed to deter him specifically from future criminal activity.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[4] This Court must sentence Staples based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Staples has pleaded guilty to Count One of the Information, charging him with Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559.  The sentencing factors set forth in 18 U.S.C.

---

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

§ 3553(a) apply here, including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

Judges in this district have sentenced Capitol breach defendants who, despite remaining inside the Capitol Building for a short period of time, entered the building at violent breach points, such as the Senate Wing Door. When a defendant's entry into the Capitol building immediately follows a violent breach, that places the defendant in a more serious category of offenders than defendants who entered the building through an area that was, if only momentarily, unguarded. A defendant, like Staples, who witnesses violent efforts to breach the Capitol building and fight back the police and who then decides to follow the mob into the building displays a heightened disregard for the law.

While it can often be difficult to identify previously sentenced cases with the same balance of aggravating and mitigating factors, that is not the case here. *United States v. Ruben Reyna*, 23-cr-350 (CKK) serves as an obvious point of comparison, because Reyna and Staples traveled together throughout the day and Reyna's offense conduct is substantially identical to this case. Specifically, Staples and Reyna attended the "Stop the Steal" rally together, walked to the Capitol together, and entered the building one after the other. In fact, Staples was the first of the pair to climb through a broken window through which Reyna followed, as police were backed against a wall and sirens blared, to breach the Capitol. He also stayed inside the building longer than Reyna.

Admittedly, Reyna had one criminal history point, so U.S.S.G. § 4C1.1 did not apply to him. But this decrease did not ultimately change Reyna's guidelines range of zero to six months—the same as Staples's guidelines range. Moreover, other factors that the Court considered in *Reyna* mirror those present here. For example, both Reyna and Staples initially tried to avoid admitting

17

entering the Capitol building until pressed by the FBI. And, in fact, Staples told the FBI that he did not think Reyna ever entered the Capitol building, despite CCTV footage showing Staples looking directly at Reyna and acknowledging him as Reyna climbed through the window. The Court in Reyna also focused on Reyna's post-January 6 statements that downplayed the severity of that day; here, Staples downplayed the events of January 6 in his FBI interview, suggesting that the police let people in or that Antifa agitators were the real problem.

The court ultimately sentenced Reyna to 14 days' incarceration, followed by 12 months of supervised release. Given their near-identical offense conduct and similar statements post-January 6, sentencing Staples to any less than 14 days of incarceration, followed by 12 months of supervised release, risks creating an unwarranted sentencing disparity.

## VI. Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Staples must pay $500 in restitution, which reflects in part the role Staples played in the riot on January 6.[6] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Staples's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 131.

## VII. Fine

The defendant's conviction for a violation of 18 U.S.C. § 1752(a)(1) subjects him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine.

---

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

19

**VIII.  Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 14 days of incarceration, followed by 12 months of supervised release. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution and a mandatory assessment of $25. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Staples's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Sean J. Brennan*
SEAN J. BRENNAN
Assistant United States Attorney
NY Bar No. 5954128
601 D Street NW
Washington, DC 20530
sean.brennan@usdoj.gov
(202) 252-7125